With that, we will move to the second case on the argument calendar, Hold Security v. Microsoft. I'll tell you what it was about, I'll tell her what it was about, pardon me, this doesn't happen very often, when we have a lawyer who's citing care, we need to know that before we take the bench. There's a button right below there, you push on it, it'll lower the, if you'd like, there you go. I don't know if it goes low enough. If you want. All right, whenever you're ready, counsel. I will be short with you. That wasn't funny. I'm ready. May I please the court, my name is Nika Aldrich, I'm with the law firm Schwalbe, Williamson & Wyatt, and we represent Hold Security. I'd like to reserve five minutes for rebuttal, and I intend to focus my arguments as the court has directed on the unfair business practices claim. The unfair business practices claim was improperly dismissed in this case for four reasons. First, the district court improperly concluded that Hold Security had an unequal bargaining position with Microsoft, an equal bargaining position with Microsoft. Second, the court placed a pleading burden on Hold Security that is beyond what Washington That factor says, did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? And that was satisfied here. We pleaded that the defendant, Microsoft, solicited this particular plaintiff, which would be indicative of the fact that Microsoft had solicited others. It was not necessary for us to name the others. Third, after finding that the first factor favors Hold Security, the court improperly weighed the factors at the pleading stage. And fourth, the court failed to provide a reasonable opportunity to amend the unfair business practices claim, holding that no amendment could cure these issues. What part of the agreement between the parties prohibited Microsoft from doing what they did? So I believe this gets to the contract claim.  So the contract said, and I will quote it directly, compromised account credential data will be used to check against Microsoft's own services, brands, and domains. And I think that the contract claim is actually rather simple here. I think, frankly, it all comes down to one word. And that word is the word will. Or the word only, which is missing. To say that I will have, you know, a cucumber sandwich for lunch says nothing about whether I'm also going to have an apple. And so I guess for my part, I would appreciate knowing why in the business, the unfair business practices claim, assuming that there is no contract claim, and I know you disagree with that, where is the sort of public interest? This is a dispute between private parties that have had a longstanding relationship. And I'm struggling, I don't fully appreciate, I guess, Washington law on this, but where is the public interest? So I've got one question on the contract claim and I've got another question on the unfair business practices claim. If I could address the contract claim first.  So to me it all comes down to the word will. And it's kind of as simple as this. My 10-year-old the other day asked if, we ran out of milk at the house, and I asked him to go to the store and get some milk, and I gave him a $5 bill, and I said, you will get milk with this money, do you understand? Now, if he came back with a pint of milk and a pocketful of candy, he knows he's in trouble because in context there, the word will means will only. In context. And the problem here is that the court refused to consider all of the extrinsic evidence that would be necessary to construe the word will, and there was a variety of extrinsic evidence that's been quoted. The court refused to consider all of that extrinsic evidence to understand how the word will is used here. The agreement said you will use it in a particular way and listed 19 domains and said you will use it in relation to these 19 domains. When you say the word will and then you identify 19 domains that you're going to be using it for, in context, you have created a closed set. And the court erred at the pleading stage by saying that this contract can't be construed otherwise. We believe that the word will here means will only in context and with all of this extrinsic evidence about the party's conduct and the negotiations, et cetera. So to me, the contract claim is rather simple, and that is the breach right there. That is the language where we believe the district court erred in misunderstanding. Now, moving on to Judge Graber's question, if I may, what we've alleged here is that Microsoft is engaged in a practice of using these form agreements, a nondisclosure agreement, the MSSA, and statements of work in order to basically take intellectual property rights from small companies through interpreting their agreements in ways that are Byzantine. And then they use that in order to take intellectual property and to squeeze those competitors out of the market. Is this in the record, what you're describing now? Well, it is in the record that they have a practice of doing this. And in fact, I believe there was a quote referenced in the complaint that said something extend and extinguish, right? So that Microsoft actually had a practice that was known as this, that's been known in the field as taking intellectual property rights from third parties and extinguishing. Now, to the extent the court finds that the pleading is insufficient here because we didn't allege enough of this type of practice. Counsel, can I get you to move back to the other claim if I could? And I want you to assume for the sake of this question that the contract actually authorizes Microsoft's conduct here. And if that's true, how does it help you to say, well, they keep entering into contracts that authorize them to do things that we don't like or that people in our situation also don't like. How does that become an unfair business practice if the parties signed a contract that permits this conduct? Well, the Washington State Supreme Court in the Hayman case said that private contracts can constitute unfair business practices and gave a list of factors that need to be considered. And there are four factors that need to be considered. Right. That's what I'm trying to get at, though, is why this isn't just an ordinary private contractual problem given the longevity of the relationship. And it just seems difficult to say that there will be other members of the public who will face an identical problem. Well, we've actually in our brief cited another case where there was an identical problem, and that's the Drute case. And the Drute case Is one enough? Is that under Washington law? Well, the Drute case is an example, and we could add the facts from the Drute case into our pleading as necessary. Well, it's still one thing. You know, if the requirement is that this be something that could affect the public, you know, maybe two examples are enough if it's something like what happens to people at a bus stop that's, you know, clearly out there in the public. But when it's this kind of a contractual relationship, I guess I'm having trouble making that connection. Well, and we already pleaded in the complaint this Microsoft practice that's known as something extend and extinguish, right? So get the intellectual property rights, extend the intellectual property rights. Counsel, you're certainly not arguing you weren't familiar with the terms of the contract when you entered into it, right? We're not arguing that we weren't familiar with those terms. And the contract seems to me very clear where it says supplier grants Microsoft a worldwide non-exclusive, perpetual, irrevocable, royalty-free, fully paid-up, write-in license under all current and future IP to do everything in the world. Yes, subject to the limitations that are in the Statement of Work, which are in Section 3B. But it doesn't say subject to that. The master agreement that I think paragraph 3D, which I think is what Judge Bennett was quoting, so even assuming that Microsoft has a license to use the data rather than an ownership interest, they are still permitted by this, expressly permitted to use the data for additional services. So I don't understand why the description of work imposes limitations on the use of the data. It says what it will be used for, but it doesn't say only that. And particularly in light of the other provision, it couldn't. Well, at the top of the master services agreement, it says that the agreement consists of multiple parts. So we need to read these multiple parts as if it is a comprehensive agreement. One of those parts is going to be Section 3D of the master services agreement. One of those parts is going to be Section 3B of the Statement of Work. And we have to harmonize those two parts with each other to read the will statement out of the agreement. No, it's descriptive of what will happen, but it's not exclusively what will happen. There's nothing conflicting about that, is there? Well, it would render that language superfluous with the top of Section 3B, which says that Microsoft will use this data to check against its own in order to reveal and protect against threats to services, brands, domains owned by Microsoft. So we should read 3D. We should read into that. Microsoft has the most extensive license you can ever grant forever to do anything at all that they ever want to do with this except if they use the data to check against someone else's services? Correct. In order to harmonize Section 3D with Section 3B. I'm having a lot of trouble seeing how that harmonizes vice rewriting. I mean, you certainly could have asked for that, right? I suppose we could have asked for that, sure. But to harmonize Section 3D with Section 3B, we need to put weight on Section 3B. It has to mean something, and it has to mean something more than what is cited in the top of Section 3B. The top of Section 3 gives us a statement of purpose. We would be rendering superfluous the language at the bottom of 3B entirely as an extraneous secondary statement of purpose, unnecessary, unless we give it some weight in the contract. And again, we're at the pleading stage here. We think that the extrinsic evidence helps to inform what Section 3B means in this contract in the totality of facts that have been pleaded, and we think it was error. I'd like to reserve some time for rebuttal if I may. Yes, you have three and a half minutes. Okay. Thank you, Your Honors. May it please the Court, David Perez representing Microsoft. This is a case about Microsoft. Counselor, could you speak a little closer to the mic, please? Adjust the table. There you go. How's that? That's good. Thank you. I'm sorry. Let me start over. Yes. David Perez representing Microsoft. This is a case about Microsoft purchasing data, specifically credential data of compromised user accounts and passwords to protect its users. And it entered into a very straightforward, plain-language contract that the terms aren't unusual, they're industry standard, with a sophisticated party, Hold, that's been around for decades. At all times, Hold was represented by counsel. They didn't enter into these contract negotiations as a small startup or as a pro se party negotiating. They had counsel throughout. They've had counsel throughout this litigation. And the contract calls for Hold to pull from its vast repository of data certain compromised usernames and passwords. That list in the SOW is a list of requirements for Hold to pull specific user accounts. It is not a limitation that Microsoft can only use the user accounts in those domains. It's more of a search term list. That's why you see asterisks next to it. It's not just hotmail.com, it's hotmail.uk, hotmail.fr. And the contract, the MSSA, which controls in any conflict over any other agreement, that's 12G of the MSSA, states that those user accounts, that data, is what we call a deliverable. And there's really no real argument that this is not a deliverable. Deliverables are literally defined as the credential data. And under the MSSA, Microsoft owns deliverables. All right. There's no limitations. In fact, the deliverable language in Section 3 states that Microsoft has all ownership in IP and that Hold, here's the verb, waves, that's the verb, waves all moral rights into the deliverables. The supplier IP argument that it's actually a license is new. They didn't make it in any iteration of the motions dismissed below. It first appeared in the opening brief to your honors. But that's what the contract allowed. Now, Hold now has buyer's remorse. Fair enough. And that's why we're here. They want their subjective intent to control over the objective manifestation in the contract. But nothing about that is deceptive, and nothing about that implicates the CPA. And here's why. There is a long line of cases, and with respect, we have not found a contrary case, where a party exercising its contractual rights, a party just simply exercising the contractual rights, can be found to be – that exercise is a deceptive conduct. And that starts with the Haywood v. Amazon case. And that was a CPA claim based on a contract claim. And there's no question this is based on the contract claim. It's the exact same conduct in both cases. And Amazon had removed certain content from its website. And the court, the district court, dismissed and said that Amazon's exercising its rights can't be a CPA violation. The contract clearly states that Amazon can do that. And then we see the T-Mobile case, which this court affirmed. And the T-Mobile case is relevant for several reasons. In that case, the consumers brought a CPA claim for a regulatory fee T-Mobile had charged its consumers. The district court dismissed. Ninth Circuit affirmed. And the Ninth Circuit said T-Mobile – the contract clearly stated T-Mobile could charge these fees. You were put on notice. They were put on notice. It was clearly disclosed. It wasn't smaller font or section 156. This is section 3. It was right there in front in the contract. And in the T-Mobile case, this court said you can't have a deceptive act, can't pass a bill, can't collect $200 if you're just exercising your rights. But T-Mobile also said this. A district court does not abuse its discretion. And that's the standard here. Abuse of discretion by denying leave to amend when there's already been amendments before. And here, this was not their first bite at the apple, although that's kind of the suggestion in the briefs. This was their third. And they're saying it was an abuse of discretion to not get a fourth bite at the apple. So what do you say to your friend's argument that we have to read will be used to check to mean used to only check or used to check only, and that that has to modify the rights given in the contract to Microsoft, that the only way to harmonize those is to read the word only in it? That's not what Microsoft did, and that the perpetual license that the contract is granting can only be a perpetual license if Microsoft is fulfilling the terms of the contract, which they aren't, because the word only should be in the contract. And they didn't approach this only. A few things. First, it would actually be minor surgery. It would be pretty extensive surgery. It wouldn't just be adding only to that portion of the SOW, but it would create a conflict between the SOW, which is a statement of work, and the MSSA, which states that Microsoft, if it's supplier IP taking their argument, Microsoft could combine it with, and this is a quote, any software, any firmware, hardware, and or service. And then the deliverable language states that hold waives all moral rights and ownership rights in the IP. So the MSSA allows Microsoft to do anything with the data, and that makes sense, and we don't need to be tech experts for this to know that once you incorporate data into software, whether it's in Edge, which is the Microsoft browser, or in LinkedIn, you've scrambled that egg, and there's no way to remove the yolk and put it back into the egg. And that's why you negotiate these industry standard terms. And so to read only into that would be pretty significant surgery on the MSSA. But if you look at that Section 3 in the SOW, this is what I think is the, with respect to the other side, I think it's a little bit of a sleight of hand. Section 3 is a search term provision. If you look at that, it's about providing these search terms that you're going to pull credentials from Microsoft, Hotmail, Xbox, et cetera. And then Section 4 is the delivery schedule. This is what you're, we're just paying for data. We're not paying for specific uses of the data, or we're not paying per use. If you look at the delivery schedule, it says you're going to deliver data on a month-by-month basis. And then the payment schedule, Section 5, we're just paying for the data. We're not paying per use. We're not paying, hey, if we add LinkedIn, we're going to have to pay if we start using it on LinkedIn or on GitHub. There's none of that. We have a fully paid-up use, and it's full and final payment in Section 5. But here's where their argument really falls apart. Section 7, if you just go one more, actually, same page, ER-208, which is additional obligations. Now, here's where we couldn't, because I believe it was Judge Bennett who asked, maybe it was Judge Hawkins, well, why didn't you just put that into the contract? Let me give Judge Bennett credit. Why didn't you just put it into the contract? Because they're arguing, folks, this is material. Folks, this is existential. We need it. It's a big deal. It's a big deal. It's a deal breaker. A deal breaker, they didn't put in the deal. But then you had a section of additional obligations, and guess what? The additional obligations only restricts holds use of the data and our data. Here was your opportunity. So the parties knew how to restrict use of the data, and they didn't take the opportunity to restrict Microsoft's use of the data. And so we get to this extrinsic evidence notion, and Washington courts, in two critical Supreme Court decisions, it was Berg, I believe that's a 95 decision, and Wilkinson, a 2014 decision, expressly reject the use of extrinsic evidence to modify or add to a contract, expressly reject it. And this course has done it time and time again. And so there's no way you could add the words they want to add and not do rather severe surgery on the MSSA and create a conflict. And under 12G, the MSSA controls. So here you have two really big obstacles. There's no deceptive act if you're simply standing on your rights. And to Judge Graber's line of questioning, this isn't a public interest, and here's why. The overarching question, and this is right out of Hengman Ridge, the overarching question at Hengman Ridge was does this have a threat to deceive a substantial portion of the public with the exact same injury? And notably in Hengman Ridge, by the way, that court found no deceptive act and no public interest. People sometimes forget that, but the court in Hengman Ridge rejected both in that case. And here there's no identical injury. Now, my friend cites Drute, which was a Western District of Washington case, could not be any more different. I'll admit I'm a little biased. I litigated that case. But Drute is very different. In Drute, Drute's a very bad decision for them. In Drute, the court rejected extrinsic evidence. In Drute, the court rejected the contract claim. In Drute, the court rejected the good faith and fair dealing claim. Drute was a payment dispute. In that milestone schedule, we're providing you data, Microsoft, to build something. And Drute's claim was you didn't pay us milestones six through ten. And it was a dispute, did you finish the work? And Drute said give us back our data because you didn't pay us enough money. And the courts read the contract and said at most you have a damages claim. But the irrevocable license is just that. It's irrevocable. The court claim was actually trade secrets. There can't be a misappropriation claim if they're allowed to use the data. And really there were these elaborate allegations about aggressive project management and threats of nonpayment. And on that, and although we disagree with the court's decision, it was the elaborate allegations of threats of nonpayment and project management that the court said maybe that's a deceptive act. It had nothing to do with this case. There's no allegations of any of that. This is not a payment case or a misappropriation case. And so the panel has no more questions. I'm happy to cede the rest of my time. All right. Thank you, counsel. And you have some time left. Is it like cribbage where I can take the rest of his time too? We are not asking to add words to the contract. We are asking to construe the contract for its meaning. And to construe the contract for its meaning, what does the word will mean? What does Section 3B mean? Washington courts require that the courts look at extrinsic evidence that may help inform that meaning. Counsel, the other question I didn't ask you earlier, in the Statement of Works Section 3, it's a description of your services. That's what the title says. And it describes 3B as a description of what you are supposed to do. So why would we read that in general? Why would we read a description of your job to include limitations on Microsoft? Well, again, I think the extrinsic evidence helps show why this is a bilateral clause that explains what we're doing and what the quid pro quo is. We will provide the information to you for you to use for this particular purpose, and you will use it for this particular purpose. And so it's captioned services. That is true. But then this is, as was discussed in the briefing, a carefully negotiated clause between our client and Microsoft that explains what both parties' obligations are. Counsel, can I ask a practical question? Of course. My understanding of the generalities in this case are that your client developed an expertise to identify compromised passwords that were out there in the dark web, if you will, and contracted with Microsoft. What did your client expect Microsoft to do with that information? Our client has indeed developed an expertise and has developed a very large database of compromised information that has gotten out.  Yes. And that database our client licenses to a variety of people so that they can use it to check their clients. Your clients? Pardon? Protect their clients. Well, yes. So, for example, when somebody logs into Hotmail and it uses a Hotmail address, that's a Microsoft service. When they log into Hotmail, Microsoft could alert them that your name and password is apparently on the dark web, and you might want to consider changing that. But that's very different from Microsoft providing a web browser, kind of like Google Chrome. In this case, they provide a web browser called Microsoft Edge. And if you use Microsoft Edge as your web browser and you go on to Bank of America to check your bank account, and you go in within the Microsoft Edge platform, you go to bankofamerica.com, and you type in your name and password there, Microsoft is taking this database and building it into Microsoft Edge so that everybody that uses Microsoft Edge gets the benefit of that with respect to their Bank of America. This isn't their Edge password. They're using Edge as a software tool. Now they're able to – now they're getting – Microsoft is telling them that your account information is compromised when you logged into Bank of America. That's not checking against Microsoft's own services. That's checking against Bank of America's. Well, but isn't it still protecting Microsoft's clients who otherwise might not want to use Microsoft Edge? Well, it is protecting Microsoft's clients, but the language says compromised account credential data will be used to check against Microsoft's own services, brands, and domains. Bank of America – Edge is a brand or a service, is it not? But they're checking Bank of America. And Bank of America is not one of Microsoft's own services, brands, or domains. In other words, Edge is just serving as a portal to get into the internet at that point. And Microsoft is building into that portal the ability to check against other brands, services, and domains out there. And that is taking away our clients' ability to sell our services to Bank of America so that Bank of America can let its clients know that its information has been compromised. And so there's a big difference between Microsoft using it for its own services, products and domains, Hotmail, LinkedIn, et cetera, and using it in a software portal that lets you go into the internet and using that for other parties' products and domains. Counsel, do you have a concluding point? Thank you, Your Honors. I appreciate your time. The panel should reverse. All right. Thank you. We thank counsel for their arguments, and the case just argued is submitted.
judges: HAWKINS, GRABER, BENNETT